COMMONWEALTH *vs.* DANIEL ROGERS.

Suffolk. December 10, 2010. - April 8, 2011.

Present: IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.[1]

*Robbery. Felony-Murder Rule. Practice, Criminal,* Instructions to jury, Lesser included offense, Public trial, Capital case. *Self-Defense. Shoplifting. Homicide. Constitutional Law,* Public trial, Confrontation of witnesses. *Evidence,* Self-defense, Expert opinion, Relevancy and materiality, Videotape.

At the trial of indictments charging the defendant with murder in the first degree on a theory of felony-murder with armed robbery as the predicate felony, the judge correctly instructed on armed robbery by conveying to the jury that a conviction must be based on a conclusion that the defendant was armed with a dangerous weapon during his taking of the property or his escape from the scene, and the judge properly declined to give the defendant's requested instruction, which would not have permitted the jury to convict the defendant if they found that he committed the stabbing solely in an effort to escape after having abandoned his attempt to steal the item in question. [251-256]

At the trial of indictments charging the defendant with murder in the first degree on a theory of felony-murder with armed robbery as the predicate felony, the judge correctly instructed that store employees may use reasonably necessary force to detain a shoplifter while investigating or calling the police [256-260]; further, although it remained an open issue whether the defendant was entitled to an instruction on self-defense in the circumstances of this case, the judge instructed on this issue as requested by the defendant, and the instruction was proper [260-261].

At a murder trial, the judge's statement, during her instructions on involuntary manslaughter, that the Commonwealth had "proved the killing was unlawful," was clearly an isolated slip of the tongue that, when considered in the context of the instructions as a whole, could not have affected the verdict. [261-262]

At the trial of indictments charging the defendant with murder in the first degree on a theory of felony-murder with armed robbery as the predicate felony, the judge did not err in declining to instruct on shoplifting as a lesser included offense of armed robbery, where the distinctions between the crimes precluded treatment of shoplifting as a lesser included offense of armed robbery. [262-263]

A criminal defendant claiming a violation of his right to a public trial failed to

---

[1]Justice Cowin participated in the deliberation on this case and authored this opinion prior to her retirement.

demonstrate either that the trial judge did anything to close the court room or that the court room was closed without the judge's knowledge. [263-264]

At a murder trial, the judge did not err in permitting a medical examiner who did not perform the autopsy of the victim properly to testify as to the cause of death, where the matter was clearly grounded in the medical examiner's background and experience and based on independently admissible evidence [264-266]; further, the judge did not abuse her discretion in declining to admit a certain video recording that lacked probative value [266-267] or in admitting a digital video recording comprised of a few still photographs [267-268].

This court concluded that any misstatement or omission in a Superior Court judge's instructions to the jury on self-defense could not have affected the outcome of a murder trial, where the jury's verdict of murder in the first degree demonstrated that they rejected the theory of self-defense altogether. [268-270]

INDICTMENTS found and returned in the Superior Court Department on May 12, 2004.

The cases were tried before *Regina L. Quinlan*, J.

*Peter B. Krupp* for the defendant.

*Elisabeth Kosterlitz Martino*, Assistant District Attorney (*Patrick M. Haggan*, Assistant District Attorney, with her) for the Commonwealth.

COWIN, J. The defendant was convicted of the murder in the first-degree of Cristian Giambrone on the theory of felony-murder with armed robbery as the predicate felony. The defendant was also convicted of assault and battery with a dangerous weapon, to wit, a knife, arising from his attack on Henry Young.[2] The case is before us on the defendant's direct appeal from these two convictions. He claims that, because any force or threats occurred only after the alleged robbery, the judge instructed improperly on armed robbery and that instruction was critical because, absent the armed robbery, there could be no conviction of felony-murder. The defendant asserts in addition that the judge should not have instructed that store employees may use reasonably necessary force to detain a shoplifter; she

[2]Murder in the first degree on the theory of deliberate premeditation was submitted to the jury, but the jury did not convict on that basis. The judge directed a verdict for the defendant on murder in the first degree on the theory of extreme atrocity or cruelty. In addition, the defendant was convicted of two counts of armed robbery, with Cristian Giambrone and Henry Young as the respective victims. The judge ordered the convictions of armed robbery filed. The defendant was acquitted of armed assault with intent to murder Young.

should have instructed on the lesser included offense of shoplifting; and she stated improperly that the Commonwealth had proved that the killing was unlawful. The defendant maintains also that the judge violated his right to a public trial by closing the court room to the public (except for the defendant's mother); and that the judge committed several other errors at trial.

We reject the defendant's arguments and, after review of the entire record, conclude that there is no reason to exercise our extraordinary power pursuant to G. L. c. 278, § 33E, to reduce the murder verdict or to grant him a new trial. We affirm the defendant's convictions.[3]

1. *Background.* A jury could have found the following facts. The defendant and two friends, Tashia Sneed and Quinnace Horton, admittedly "professional" shoplifters, habitually shoplifted merchandise from small stores, selling it to support their drug habits. On February 16, 2004, the defendant and the two others were engaged in shoplifting at the CVS store on Longwood Avenue in Boston. When the defendant was detected stealing toothpaste, he ran from the store, chased by Cristian Giambrone, a CVS clerk. Henry Young and Showky Lara, two other CVS employees, became aware of the situation and joined the chase. Two or three employees wore blue CVS uniform shirts with the CVS logo on the front. Giambrone was the first to catch up to the defendant and "flung" him against a wall. The employees struggled with the defendant as toothpaste fell from his coat. Lara told the defendant that they were taking him back to the CVS store because he had been shoplifting. The defendant refused to go and reached into his pocket, "flick[ed]" something and stabbed Young and then Giambrone. The latter died from his injuries.

The defense at trial was lack of identification of the defendant as the stabber. In the event the defendant were the stabber, he claimed self-defense. In addition, the defendant attacked the quality of the police investigation.

2. *Armed robbery instruction.* As stated, armed robbery was

---

[3]The conviction of armed robbery of Cristian Giambrone, see note 2, *supra,* now should be vacated and the indictment dismissed. See *Commonwealth* v. *Lopes,* 455 Mass. 147, 148 (2009) (conviction of predicate offense underlying conviction of murder in first degree on theory of felony-murder is duplicative).

the predicate felony for the defendant's conviction of felony-murder. The defendant maintains that the judge's instruction on armed robbery (reprinted in the margin)[4] was flawed because it permitted the jury to convict the defendant if they found that he stabbed the two victims solely in an effort to escape and that, before the stabbing occurred, he had abandoned his attempt to steal the toothpaste. To avoid such a possibility, the defendant requested an instruction, the content of which is reprinted in the margin.[5] The judge did not give the requested instruction and, after she completed her charge, the defendant objected to the omission of this instruction. We review to determine whether

[4]"The first element that the Commonwealth must prove beyond a reasonable doubt for the offense of armed robbery is, first, that the defendant was armed with a dangerous weapon. This means that the Commonwealth must prove that the defendant had a dangerous weapon in his possession. The crime of armed robbery is based upon the potential for injury. The potential for injury does not depend on the precise moment at which the defendant becomes armed, so long as he becomes armed at a point that is directly related to the commission of the robbery. . . .

"The law of armed robbery does not require the Commonwealth [to] show that the instrument or the weapon was actually used. It is enough if the Commonwealth proves beyond a reasonable doubt that the defendant was actually armed with a dangerous weapon at some point during the course of the robbery. The point at which the defendant became armed is not important as long as he becomes armed at a point that directly related to the commission and completion of the robbery. Completion of the robbery not only includes the taking of the property but also includes the escape or successful completion of the robbery.

"The second element that the commonwealth must prove beyond a reasonable doubt is that the defendant either applied actual force or violence to the body of the person identified in the indictment, or by words or gestures put him in fear. In other words, that he committed an assault on that person.

"The third element that the Commonwealth must prove beyond a reasonable doubt is that the defendant took the money or other property, or the property of another with intent to steal it. . . .

"If the Commonwealth proves beyond a reasonable doubt that the defendant armed himself with a dangerous weapon after the taking of the property and used that dangerous weapon to effectuate the taking of the property or to effectuate his escape from the scene, that would be sufficient to convert the taking of the property into an armed robbery. If, however, the defendant armed himself with a dangerous weapon after the taking of the property for a purpose unrelated to the taking or successful completion of the taking of the property, that would not be sufficient for armed robbery."

[5]The defendant requested the following instruction:

"The intent to steal must coincide with the use of force or threats by

there was error, and, if so, whether the error prejudiced the defendant. *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994).

The judge's instruction was proper. It conveyed to the jury that a conviction of armed robbery must be based on a conclusion that the defendant was armed with a dangerous weapon during his taking of the property or his escape from the scene.[6] See G. L. c. 265, § 17 ("Whoever, being armed with a dangerous weapon, assaults another and robs, steals or takes from his person money or other property which may be the subject of larceny shall be punished by imprisonment . . ."). The defendant, however, seeks to parse the crime of armed robbery by dividing it into discrete segments. He claims that when he stabbed the victims he had "abandoned" his intent to steal the property; thus, because the stabbing was separated from the taking of the property and that taking lacked the element of force, the taking never became an armed robbery. This argument fails because, as the judge stated in the final paragraph of the above-quoted instruction, the force necessary for robbery may be used either to accomplish the taking of the property or to effect the escape.

Our decision in *Commonwealth* v. *Mavredakis*, 430 Mass. 848, 854-855 (2000), illustrates that the crime is not to be segmented as the defendant would have us do. In the *Mavredakis* case, the defendant and his joint venturers broke into an

the defendant. Therefore, it is not robbery if a person sets out to commit an assault, and then as an afterthought commits a theft.

"In the same way, if a person has committed a theft that is over and done with or abandoned, and then afterwards displays force or threats, that is not a robbery unless the Commonwealth proves beyond a reasonable doubt that the thief has a continuing intent to steal the money or property in question."

[6]As the judge's instruction noted, the crime of armed robbery does not require that the perpetrator utilize the weapon in the perpetration of the robbery. The charge is armed robbery to account for the fact that a weapon's presence, whether or not it is used, creates a greater potential for injury. See *Commonwealth* v. *Blackburn*, 354 Mass. 200, 205 (1968) ("The gist of the charge is committing a robbery while armed"). See also *Commonwealth* v. *Tarrant*, 367 Mass. 411, 415 (1975). Similarly, the perpetrator need not display the weapon or otherwise make the victim aware of its presence. See *Commonwealth* v. *Simpson*, 54 Mass. App. Ct. 477, 479 (2002); *Commonwealth* v. *Goldman*, 5 Mass. App. Ct. 635, 637-638 (1977) ("The statute manifests no requirement that the victim be aware of the . . . weapon").

empty restaurant and removed the contents of the safe. When the manager returned, the defendants hid and then shot him. The defendant argued that the crime was one of breaking and entering only and that the victim was shot in the course of that crime. He contended that no force was used until after the intruders completed the taking of the property and thus no armed robbery had occurred. We concluded, contrary to the defendant's contention, that "what began as a breaking and entering and a larceny was converted into an armed robbery once the victim arrived on the scene." *Id.* at 855.

Other cases have similarly refused to adopt the defendant's approach. In *Commonwealth* v. *Rajotte*, 23 Mass. App. Ct. 93 (1986), discussed with approval in *Commonwealth* v. *Mavredakis*, *supra* at 854-855, the defendant's theft was interrupted by a restaurant employee. After being convicted of armed robbery, the defendant argued on appeal, much as the defendant does here, that the taking was "not effected by force or threat of force" and thus was only a larceny and not a robbery. He contended that the intimidation occurred only after he was caught by the employee. Rejecting the defendant's theory, the Appeals Court held that the larceny was converted into a robbery because the assault was committed on a person with a "protective concern" for the goods taken (akin to that of the victims in the present case) who had interfered with the completion of the theft (similarly to the victims here). *Id.* at 94-96. See *Commonwealth* v. *Sheppard*, 404 Mass. 774, 778 (1989) ("Even if the jury believed that the defendant pushed [the victim] immediately after the defendant actually took the [property], the jury were free to draw the reasonable inference that the defendant used the force to facilitate the larceny"); *Commonwealth* v. *Smith*, 21 Mass. App. Ct. 619, 624 (1986), *S.C.*, 400 Mass. 1002 (1987) (fact finder may look at episode "as a continuum and reject as a manufactured abstraction" idea that assault occurred after taking was completed). Cf. *Commonwealth* v. *Goldstein*, 54 Mass. App. Ct. 863, 867-870 (2002). Our appellate courts have refused to segment the crime of armed robbery; we continue to refuse to do so.[7]

The defendant maintains, however, that "if Rogers armed

---

[7]Reflecting the modern view, the American Law Institute's Model Penal

himself after abandoning, or attempting to abandon, the tooth-paste and without a continuing intent to effectuate the taking, he has not committed an armed robbery." Even if there were evidence of abandonment, there is no evidence that the defendant armed himself after such abandonment. When the defendant pulled a knife from his clothing he was engaged in a struggle with three men who had chased him directly from the CVS store. The three employees had followed him from the store until they caught him a short distance from it. There is no evidence that the defendant armed himself between his taking of the goods and his physical confrontation with the employees.

Moreover, the concept of abandonment is not applicable here. "Abandonment" is a term associated with joint venture and requires that there be "at least an appreciable interval between the alleged termination and [the commission of the crime], a detachment from the enterprise before the [crime] has become so probable that it cannot reasonably be stayed." *Commonwealth* v. *Miranda*, 458 Mass. 100, 118 (2010), quoting *Commonwealth* v. *Cook*, 419 Mass. 192, 202 (1994).

The defendant argues that he was abandoning the toothpaste, but there was no evidence of abandonment. The defendant was simply caught in the act of stealing the toothpaste and seeking to make his escape. The evidence indicates that the goods were falling from his clothing. There was no evidence that he was actively throwing anything from his person. Even if his actions could theoretically be viewed as abandonment, there must be "an appreciable interval between the alleged termination and the fatal [act.]" *Commonwealth* v. *Dellelo*, 349 Mass. 525, 529-530 (1965). In that case, we were discussing the time necessary between a robbery and a killing for the robbery to have ended and therefore to be separate from the killing. We said that

"[w]hether the . . . crime was completely over . . . [is] marked by what is done, rather than what is thought

---

Code and Commentaries § 222.1(1) comment 2(*b*), at 104-105 (1980), speaks of force or threat of force occurring "in the course of committing a theft," including even the period of flight after the commission. Some, primarily older, cases define a taking more narrowly. See, e.g., W.R. LaFave, Criminal Law § 20.3(d), at 1055-1056 (5th ed. 2010). See also Model Penal Code and Commentaries, *supra*, § 222.1 (1) and comment 2(*b*).

. . . . An attempted robbery is not ended merely because one or both of the robbers cease to desire to proceed, has in mind only a purpose to escape, and shoots in furtherance of that purpose. There must be an appreciable interval between the alleged termination and the fatal shooting. . . . Even though the attempted or accomplished crime of robbery may technically be said to be complete, if the homicide is committed while the killer is engaged in one of the elements incident to the crime such as an escape or flight, the killing is referable to the robbery; and whether the act of escape or flight is a continuous part of the attempted or accomplished crime is for the jury to determine."

*Id.* The same concepts apply in this case.

3. *Reasonable force to detain shoplifter.* In another attack on the armed robbery conviction, the defendant alleges that the judge should not have instructed, as reprinted in the margin,[8] that a merchant may use force to detain a shoplifter while investigating or calling the police. He claims that this instruction undermined his self-defense argument because it permitted the jury to conclude that the store employees acted lawfully in chasing, apprehending, and using force against him. Thus, he contends, "the jury may have found that it would not have been objectively reasonable for [the defendant] to have believed that the store employees . . . were threatening [him] with serious bodily harm." Because the defendant objected, we again review to see if there was error, and if so whether the error prejudiced the defendant.

The right to detain shoplifters arises from G. L. c. 231, § 94B,[9] which permits store employees with suspicion based on reasonable grounds to detain a suspected shoplifter for a

---

[8] "[Y]ou should be aware that irrespective of policy, the law does permit merchants through their employees to detain persons reasonably believed to have engaged in so-called shoplifting if they have a reasonable basis for that belief and if they use no more force than reasonably necessary to detain them for investigation or to call the police."

[9] "In an action for false arrest or false imprisonment brought by any person by reason of having been detained for questioning on or in the immediate vicinity of the premises of a merchant or an innkeeper, if such person was detained in a reasonable manner and for not more than a reasonable length of time by a person authorized to make arrests or by the merchant or innkeeper or his agent or servant authorized for such purpose and if there were reasonable grounds to believe that the person so detained was committing or attempting to commit a

reasonable time and by reasonable means. See *Foley* v. *Polaroid Corp.*, 400 Mass. 82, 89-90 (1987), citing *Proulx* v. *Pinkerton's Nat'l Detective Agency, Inc.*, 343 Mass. 390, 392-393 (1961). There is no question here that the employees had reasonable grounds for believing that the defendant was stealing goods from the store. Contrast *Coblyn* v. *Kennedy's, Inc.*, 359 Mass. 319, 323 (1971). The statute creates an affirmative defense to charges of false arrest and false imprisonment for merchants who detain suspected shoplifters "in a reasonable manner." In her instructions to the jury, the judge interpreted that language to allow use of "no more force than is reasonably necessary to temporarily detain [the suspect] for investigation or to call the police." The defendant challenges the instruction, arguing that the statute "does not authorize use of any force, let alone as much force as is 'reasonably necessary.' "

Few of our cases have addressed the application of G. L. c. 231, § 94B. See *Coblyn* v. *Kennedy's, Inc.*, *supra*; *Proulx* v. *Pinkerton's Nat'l Detective Agency, Inc.*, *supra*. Neither case clarifies whether physical force may ever constitute "a reasonable manner" of detention. In *Coblyn* v. *Kennedy's, Inc.*, *supra* at 320, the elderly plaintiff was detained by a suspicious store employee who "firmly grasped" his arm. We noted that "[w]e need not decide whether the detention was effected in a reasonable manner for . . . there were no reasonable grounds for believing that the plaintiff was committing larceny and, therefore, he should not have been detained at all." *Id.* at 323. In dicta, we observed that some features of the detention, including but not limited to "physical restraint . . . imposed upon the plaintiff," *could* be found "to constitute an unreasonable method by which to effect detention." *Id.*

In *Proulx* v. *Pinkerton's Nat'l Detective Agency, Inc.*, *supra* at 391-392, the plaintiff store employee was detained and questioned. We held that she was not "detained in an unreasonable way or for an unreasonable time." *Id.* at 393. In holding her detention reasonable, we noted among other factors that "[t]here

violation of section thirty A of chapter two hundred and sixty-six, or section twelve of chapter one hundred and forty, or was committing or attempting to commit larceny of goods for sale on such premises or larceny of the personal property of employees or customers or others present on such premises, it shall be a defense to such action." G. L. c. 231, § 94B.

were no acts of physical force, threats or other conduct that indicate any restraint upon her." *Id.* Neither the case of *Coblyn* v. *Kennedy's, Inc., supra,* nor *Proulx* v. *Pinkerton's Nat'l Detective Agency, Inc., supra,* holds, as the defendant suggests, that a reasonable detention *cannot* include the use of "reasonably necessary" force.[10],[11]

Many other States have "shopkeeper's privilege" statutes similar to G. L. c. 231, § 94B. See Annot., Construction and Effect, in False Imprisonment Action, of Statute Providing for Detention of Suspected Shoplifters, 47 A.L.R.3d 998 (1973 & Supp. 2010) (collecting cases construing these statutes). Because most, if not all, of those statutes contain the phrase "in a reasonable manner" found in G. L. c. 231, § 94B,[12] cases in other jurisdictions are useful in assessing the defendant's contention in this case.

In general, cases in other jurisdictions suggest that force may be a component of a reasonable detention so long as the force used is itself reasonable. See *Kmart Corp* v. *Perdue,* 708 So. 2d 106, 110 (Ala. 1997) (privilege applied where employee did not

[10]Another case, *Foley* v. *Polaroid Corp.,* 400 Mass. 82, 89-90 (1987), clarifies that G. L. c. 231, § 94B, places the burden on the detaining party to show the detention was reasonable rather than on the person detained to show it was unreasonable.

[11]In addition, pursuant to common law, an individual was permitted to use reasonable force to regain possession of property taken wrongfully. See *Commonwealth* v. *Donahue,* 148 Mass. 529, 531 (1889); *Commonwealth* v. *Haddock,* 46 Mass. App. Ct. 246, 248 n.2 (1999). See also Annot., Construction and Effect, in False Imprisonment Action, of Statute Providing for Detention of Suspected Shoplifters, 47 A.L.R.3d 998 § 3 (1973 & Supp. 2010) ("At common law, if a person observed another wrongfully relieving him of his belongings, he was permitted to use reasonable force to retake the goods").

[12]See, e.g., Ala. Code § 15-10-14(*a*) (Michie 1995); Ariz. Rev. Stat. Ann. § 13-1805(*C*) (Thomson Reuters 2010); Colo. Rev. Stat. Ann. § 18-4-407 (West 2004); Nev. Rev. Stat. § 597.850(3) (2009); N.J. Stat. Ann. § 2C:20-11(*e*) (Thomson Reuters Supp. 2010); N.Y. Gen. Bus. Law § 218 (McKinney 2004); N.C. Gen. Stat. Ann. § 14-72.1(*c*) (2009); Ohio Rev. Code Ann. § 2935.041(*A*) (West 2006); Okla. Stat. Ann. tit. 22, § 1344 (West 2003); Pa. Cons. Stat. Ann. tit. 18 § 3929 (*d*) (West Supp. 2010); Tex. Code Ann. Civ. Prac. & Rem. § 124.001 (2011). See also Ga. Code Ann. § 51-7-60 (2) (Michie 2000) ("manner of the detention . . . was under all the circumstances reasonable"); Ind. Code Ann. § 35-33-6-2 (*c*) (LexisNexis Supp. 2010) (detention must "be reasonable and last only for a reasonable time"). At least one State statute authorizes explicitly the use of "reasonable force," La. Code Crim. Proc. Ann. art. 215 (*A*) (1) (West 2003), and another prohibits the use of "unreasonable force." Minn. Stat. § 629.366 subdiv. 1 (*c*) (West 2009).

use "any more force than was necessary"); *Gortarez* v. *Smitty's Super Valu, Inc.*, 140 Ariz. 97, 104-105 (1984) (adopting Restatement position that "[r]easonable force may be used to detain the person"); *K-Mart Corp.* v. *Washington*, 109 Nev. 1180, 1188 n.6 (1993) ("Most [S]tates, including Nevada, permit a shopkeeper to use reasonable force . . ."); *Watkins* v. *Sears Roebuck & Co.*, 289 A.D.2d 73, 73 (N.Y. 2001) (fleeing shoplifter tackled by security guard; use of nondeadly force reasonable); *Redding* v. *Shelton's Harley Davidson, Inc.*, 139 N.C. App. 816, 819 (2000); *Hainz* v. *Shopko Stores, Inc.*, 121 Wis. 2d 168, 174 (1984) (equating "reasonable manner" with "reasonable *force* in detaining" [emphasis in original]).

The defendant argues that the Restatement (Second) of Torts supports his claim that force may not be used. He notes that the Restatement permits a merchant, faced with a suspected shoplifter, "without arresting the other, to detain him on the premises." Restatement (Second) of Torts § 120A (1965). He argues that, because "arrest" means "forcible restraint," the Restatement permits detention but not the use of physical force.

Contrary to the defendant's assertion, the Restatement supports explicitly the Commonwealth's view that reasonable force is permitted. The comments accompanying § 120A are clear:

> "Reasonable force may be used to detain the suspected person; but, as in the case of the recaption of chattels (see § 106),[13] the use of force intended or likely to cause serious bodily harm is never privileged for the sole purpose of detention to investigate, and it becomes privileged only where the resistance of the other makes it necessary for the actor to use such force in self-defense. . . ."

*Id.* at § 120A comment h.

---

[13]The Restatement (Second) of Torts § 106 (1965) reiterates the common-law privilege, noted in *Commonwealth* v. *Donahue, supra*, to use reasonable force in recovering chattels:

> "The use of force against another for the purpose of recaption is not privileged unless the means employed are

> "(a) not in excess of those which the actor correctly or reasonably believes to be necessary to effect the recaption, and

> "(b) not intended or likely to cause death or serious bodily harm."

Furthermore, the term "arrest" clearly is not intended in the way the defendant claims: "The privilege stated in this Section differs from the privilege of arrest in that it permits only temporary detention on the premises,[14] and not the taking of the other into custody. . . ." *Id.* at § 120A comment d. We add that the privilege is meaningless if reasonable force cannot be used. It makes no sense to assume that shoplifters caught in the act will simply comply with a request to wait for the police to arrive. Accordingly, we conclude that shopkeepers may use reasonable force appropriate to the circumstances in detaining suspected shoplifters. The judge's instruction was appropriate.

4. *Self-defense.* We have concluded above, see parts 2 and 3, *supra*, that the flight from the CVS store did not terminate the felony and that the CVS employees could use reasonable force to detain the defendant. In a letter submitted pursuant to Mass. R. A. P. 16 (l), as amended, 386 Mass. 1247 (1982), the defendant maintains that he was entitled to assert self-defense as a defense to a murder committed during a felony that he initiated.

Generally, in Massachusetts, one who commits an armed robbery cannot assert a claim of self-defense. See, e.g., *Commonwealth* v. *Vives*, 447 Mass. 537, 544 n.6 (2006), citing *Commonwealth* v. *Griffith*, 404 Mass. 256, 265 (1989) ("The right to claim self-defense is forfeited by one who commits armed robbery"). But see *Commonwealth* v. *Roderick*, 429 Mass. 271, 278 n.2 (1999) (where armed robbery was predicate of felony-murder conviction, instruction on self-defense "was entirely proper").[15] The rationale for this rule is that the nature of the underlying felony marks the defendant as the "initiating and dangerous aggressor." *Commonwealth* v. *Garner*, 59 Mass. App. Ct. 350, 363 n.14 (2003). The present case, however, may not fit well within that general rule. The weapon was not used except during the defendant's attempted escape, see part 2, *supra*,

---

[14]We discern no basis for reading the "on the premises" language as a limitation. Our shopkeeper's privilege statute, G. L. c. 231, § 94B, permits a merchant to detain a suspect "on or in the immediate vicinity of the premises." See note 9, *supra*; *Commonwealth* v. *Hudson*, 404 Mass. 282, 287-288 & n.7 (1989).

[15]Cases in other jurisdictions are split on the application of the defense of self-defense to a charge of felony-murder. See 40 Am. Jur. 2d Homicide § 142, at 741 (2008).

and we have added a second legal construct, i.e., that the armed robbery continued during the defendant's flight. Our cases stating that the armed robber forfeits the right of self-defense did not arise in such a context.

We need not resolve the issue on this record. Assuming without deciding that the defendant was entitled to an instruction on self-defense in the circumstances of this case, the judge instructed on this issue and the instruction was proper.[16] The judge stated correctly that a homicide "committed in the proper exercise of self-defense is excused and therefore not a crime." She also told the jurors at a later point that "if the Commonwealth has failed to prove that the defendant committed an unlawful and unjustified killing, that's the end of your inquiry on the [murder] indictment." The judge defined self-defense generally, then referenced back to that concept in connection with both her instructions on deliberate premeditation and her instructions on felony-murder with armed robbery as the underlying felony. She devoted almost four pages of transcript to defining self-defense, its requirements, and the Commonwealth's burden of proof on the subject. She explained clearly the circumstances that permit the use of deadly force. Later, immediately after elucidating the elements of murder in the first degree, she re-minded the jurors of the concept of self-defense. The defendant received all to which he was entitled (and perhaps more).

5. *Instruction that the Commonwealth "proved the killing was unlawful."* The defendant next contends that, in her instruction on involuntary manslaughter, the judge erred by instructing that "the Commonwealth proved the killing was unlawful." The defendant quotes the judge correctly. The subject instruction is reprinted in the margin.[17] The defendant did not object; therefore, we review to determine whether the instruction was erroneous and, if so, whether the error created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Serino*, 436 Mass. 408, 417-418 (2002). Although, as the Commonwealth concedes,

---

[16]But see part 9, *infra*, regarding the instruction on self-defense in the context of the manslaughter instruction.

[17]"To prove involuntary manslaughter the Commonwealth must prove beyond a reasonable doubt that the defendant committed an unintentional and unlawful killing of Mr. Giambrone. To satisfy this element, the Commonwealth proved the killing was unlawful."

the judge misstated the law, it was clearly a slip of the tongue and there was no substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Oliveira*, 445 Mass. 837, 844-845 (2006).

We construe jury instructions as a whole. Isolated misstatements included in a comprehensive charge to the jury do not constitute reversible error when there is little likelihood that the jury would have misunderstood the correct import of the entire charge. See *Commonwealth* v. *Niemic*, 427 Mass. 718, 720 (1998), quoting *Commonwealth* v. *Galford*, 413 Mass. 364, 371-372 (1992), cert. denied, 506 U.S. 1065 (1993) (appellate court reviews instructions as whole, considering adequacy in light of over-all impact on jury). The judge instructed properly on the Commonwealth's burden to prove an unlawful killing nine times. Indeed, the judge twice instructed that if the Commonwealth had failed to prove "an unlawful killing" of the victim, "that's the end of [the] inquiry" "on the [murder] indictment." The one improper reference considered in the context of the instructions as a whole could not have affected the verdict. See *Commonwealth* v. *Ruddock*, 428 Mass. 288, 292 n.3 (1998). See also *Commonwealth* v. *Grant*, 418 Mass. 76, 85 (1994) ("A reasonable juror could not have . . . been misled by [the] slip of the tongue" in the instruction).

In addition, the jury convicted the defendant of murder in the first degree; therefore, they did not reach the question of involuntary manslaughter. See *Commonwealth* v. *Silva-Santiago*, 453 Mass. 782, 805 (2009) (judge's slip of tongue in instruction on murder in second degree did not create "even a remote likelihood of a miscarriage of justice" where "the jury found the defendant guilty of murder in the first degree, and therefore did not reach the question of murder in the second degree").

6. *Shoplifting as lesser included offense of armed robbery.* The defendant argues that the judge erred when she refused to instruct on shoplifting as a lesser included offense of armed robbery. The defendant requested such an instruction and objected when the judge refused to give it. There was no error because shoplifting is not a lesser included offense of armed robbery. A crime is not a lesser included offense of another if each requires proof of an additional element that the other does not. See

*Commonwealth* v. *Jones*, 382 Mass. 387, 393 (1981). Armed robbery requires that one be armed with a dangerous weapon, assault another, and rob, steal, or take from his person money or other property which may be the subject of larceny. See G. L. c. 265, § 17. By contrast, the shoplifting statute, G. L. c. 266, § 30A, penalizes "[a]ny person who intentionally takes possession of . . . any merchandise displayed, held, stored or offered for sale by any store or other retail mercantile establishment with the intention of depriving the merchant of [its] possession . . . without paying to the merchant the value thereof." Armed robbery requires the use of a dangerous weapon and force. Shoplifting includes the additional element that the property taken be that of a "merchant." These distinctions preclude treatment of shoplifting as a lesser included offense of armed robbery.

7. *Closure of the court room.* The defendant asserts that his right to a public trial, guaranteed by the Sixth Amendment to the United States Constitution, was violated because the court room was closed during jury selection. Such a violation, if it occurred, is a structural error not subject to harmless error analysis. Even so, we must determine whether the defendant raised the issue in a timely manner because "the right to a public trial, like other structural rights, can be waived." *Commonwealth* v. *Cohen (No. 1)*, 456 Mass. 94, 105-106 (2010), quoting *Commonwealth* v. *Edward*, 75 Mass. App. Ct. 162, 173 (2009). See *Mains* v. *Commonwealth*, 433 Mass. 30, 33 n.3 (2000) ("Our cases have held that even structural error is subject to the doctrine of waiver").

A defendant claiming a violation of his right to a public trial must show that the court room was closed to the public. Some affirmative act by the court or one acting on its behalf is required. *Commonwealth* v. *Cohen (No. 1)*, *supra* at 107-108. The defendant has not met his burden of showing either that the trial judge did anything to close the court room or that the court room was closed without the judge's knowledge. To the contrary, the only incident to which he points indicates that the judge sought to make the court room open to the public. The judge ordered that the back door of the court room remain open during jury empanelment so that the defendant's mother, and presumably other members of the public, could observe the empanelment.

The defendant maintains that a discussion between his counsel and the judge at the outset of empanelment indicates that the court room was not open. When it was obvious that every available seat in the court room was needed for the venire, counsel stated to the judge: "To make room for all the jurors the court room was entirely cleared of spectators, including my client's mother . . . the jury selection should not be closed to the public, and my client's mother should be permitted to observe." In response, the judge ordered the back door of the court room to remain open and counsel said, "Thank you." Thus, the judge balanced the need for the public to have access to empanelment proceedings with the need to provide space for prospective jurors. See *Waller* v. *Georgia*, 467 U.S. 39, 48 (1984).

Even if there were a partial closure, which has not been established on the present record, the defendant has waived this claim. See *Commonwealth* v. *Cohen (No. 1)*, *supra* at 105-106. Having indicated his assent to the judge's remedy for the overcrowding (i.e., the opening of the back door), the defendant may not now be heard to complain of the strategy that was adopted.

8. *Trial errors.* a. *Medical examiner's testimony.* The defendant maintains that his Sixth Amendment right to confront witnesses was violated when Dr. Flomenbaum, a medical examiner who did not perform the autopsy of the victim, was permitted to testify as to cause of death. The defendant filed a motion in limine to exclude Dr. Flomenbaum's testimony on this ground, which was denied, and he objected to the testimony when it was offered. Thus, we review to determine whether there was error, and if so whether that error was harmless beyond a reasonable doubt. *Commonwealth* v. *Durand*, 457 Mass. 574, 586-588 (2010).

The testimony of Dr. Flomenbaum and the defendant's objection thereto took place after *Crawford* v. *Washington*, 541 U.S. 36 (2004) (*Crawford*); *Commonwealth* v. *Gonsalves*, 445 Mass. 1 (2005), cert. denied, 548 U.S. 926 (2006); and *Commonwealth* v. *Verde*, 444 Mass. 279 (2005). However, the case was tried before our decision in *Commonwealth* v. *Nardi*, 452 Mass. 379 (2008) (*Nardi*). In *Crawford*, *supra* at 53-54, the United States Supreme Court held that the Sixth Amendment prohibits the admission of testimonial out-of-court statements unless the declarant is unavailable to testify and the defendant had a prior

opportunity to cross-examine the declarant. As a result of the *Crawford* decision, in *Nardi* we considered the issue of the admissibility of testimony of a substitute medical examiner who did not perform the autopsy of the victim.

Of particular relevance to the present case, *Nardi* restated our case law that testifying expert witnesses may base their opinions on (1) facts personally observed; (2) facts assumed in the questions put to the expert and supported either by admitted facts or by the testimony of other witnesses already given or to be given at the trial; or (3) facts or data not in evidence if the facts or data are independently admissible and are a permissible basis for an expert to consider in formulating an opinion. *Nardi, supra* at 388, quoting *Commonwealth* v. *Markvart,* 437 Mass. 331, 337 (2002). See *Department of Youth Servs.* v. *A Juvenile,* 398 Mass. 516, 531 (1986). We stated further, see *Nardi, supra* at 388-391, that a substitute medical examiner may testify to his or her own opinion concerning the victim's cause of death. A testifying medical examiner, however, may not testify on direct examination to the underlying factual findings contained in an autopsy report prepared by a different medical examiner. *Nardi, supra* at 391. See *Commonwealth* v. *Avila,* 454 Mass. 744, 760-762 (2009). See also *Commonwealth* v. *Durand, supra* at 583-585.

In the present case, Dr. Flomenbaum reviewed the autopsy report of Dr. Evangelista (the medical examiner who performed the autopsy), Dr. Evangelista's photographs and notes, "notes" from the emergency medical technician, the emergency room doctors' "notes," toxicology reports, and other material. Based on his review of these materials, Dr. Flomenbaum opined that the cause of death was "the stab wound to [the victim's] neck." The opinion of the cause of death was not contested at trial. It was stated as well in the death certificate which was properly admitted. In addition, there was extensive eyewitness testimony that the victim had been stabbed in the neck.

Dr. Flomenbaum based his testimony primarily on two autopsy photographs, both of which were admitted in evidence at trial.[18] Indeed, he referred to them extensively and they were projected

---

[18]The Commonwealth concedes that these photographs were "arguably erroneously" admitted because they were not properly authenticated. However,

on screen as he testified. Much of Dr. Flomenbaum's testimony was directed to the general physiological effects of the stab wound to the neck. This was a matter clearly grounded in his background and experience and based on independently admissible evidence (the photographs). He also identified a knife (found in the general area to which the defendant ran after the incident) as consistent with having inflicted the wound he had observed in the photographs. His opinion was based on comparing the knife with the photographs he examined and which had been admitted. (The doctor directed much testimony during his examination of the photographs to the type of knife that would have inflicted the wound.) There was no error in the admission of the above testimony.

Dr. Flomenbaum appeared as a witness, opined as an expert on the basis of information on which experts ordinarily and properly rely, and was subject to cross-examination. These aspects of his testimony are controlled by *Nardi, supra* (right of confrontation not violated when medical examiner who did not perform autopsy allowed to testify to his own opinion of cause of death).

However, Dr. Flomenbaum also testified on direct examination to the length and depth of the stab wound, and that the bleeding came "through the air pipe, not as a result of injury to the lung itself." These underlying factual findings (presumably from the autopsy report) should not have been admitted on direct examination. See *id.* at 391-394. They were not relevant, however, to any contested issues. As mentioned, the defense was lack of identification of the defendant as the stabber, self-defense (if the defendant were the stabber) and shoddy police work. Any error in admitting these factual findings was harmless.[19]

b. *CVS training video recording.* The defendant maintains

because the photographs could have been admitted if authenticated, and therefore may be relied on by an expert in making an opinion, they were "independently admissible." See *Commonwealth* v. *Durand,* 457 Mass 574, 584 (2010).

[19]The defendant asserts that Dr. Flomenbaum could not answer questions about the angle of the knife wound which the doctor who performed the autopsy could have answered. The short answer to this contention is that, if the defendant wished to question that medical examiner, the defendant could

that he should have been permitted to introduce a CVS training video recording concerning shoplifting. He asserts that the video recording was relevant to show that the CVS employees acted outside the scope of their duties when they chased him and that the defendant was more likely to have been reasonable in using self-defense. The decision whether to admit such evidence lies in the sound discretion of the judge and there was no abuse of discretion here. See *Commonwealth* v. *Talbot*, 444 Mass. 586, 589 n.2 (2005). The recording was not probative of what occurred during the confrontation. By such time, the employees had already violated the restrictions on apprehension of shoplifters described in the recording. Moreover, there was no evidence that the employees had ever seen the recording.

c. *Still surveillance video recording.* The defendant complains that he was prejudiced by the admission, over his objection, of a digital video recording. He argues that the recording was comprised of a few still photographs (all concededly independently admitted) based on "assumptions that were not true (e.g., the images from the camera were not captured at a constant rate although each of the images on the [recording] were reproduced so that they appear on the screen for the same number of seconds)." This procedure made it appear "misleadingly" as if the person seen was running from the CVS, was the only person present, and was dropping or kicking something (which the Commonwealth alleged were two toothpaste boxes).

"When, as here, the demonstrative photograph is generated as a digital image or video image, the judge must determine whether the image fairly and accurately presents what it purports to be, whether it is relevant, and whether its probative value outweighs any prejudice to the other party." *Renzi* v. *Paredes*, 452 Mass. 38, 52 (2008). "Concerns regarding the completeness or production of the image go to its weight and not its admissibility." *Id.*

---

have sought to summons him. There is no suggestion in the record that he did so. In addition, our review of the transcript indicates that the only questions in this area that Dr. Flomenbaum could not answer were ones dependent on events at the scene (e.g., whether the victim or the stabber turned while the knife was in the body and the precise location of various individuals at the scene). It is highly speculative that any witness could have offered such evidence based on the performance of an autopsy.

Here, the digital video recording was authenticated by the officer who created the compilation. He described the process used to create it. The judge took the precaution of conducting a voir dire before determining that the recording fairly and accurately presented what it purported to be. She concluded in addition that it was relevant and that its probative value outweighed any prejudice to the defendant. The defendant claims also that the recording was cumulative of the still images that were in evidence. Rulings on cumulative evidence fall within the judge's discretion. See *Commonwealth* v. *Clemente*, 452 Mass. 295, 306 (2008), cert. denied, 555 U.S. 1181 (2009). There was no abuse of discretion in the admission of the digital video recording.

9. *Review under G. L. c. 278, § 33E.* Although not raised by the defendant, our review of the record reveals issues relating to the judge's instructions. The judge instructed:

> "The Commonwealth also has the burden of proving beyond a reasonable doubt the absence of self-defense, proof of a negative. If the Commonwealth has failed to prove to you beyond a reasonable doubt the absence of self-defense, a killing committed during the exercise of self-defense, even if it was excessive force used and therefore not a justified killing, would be reduced to manslaughter because the Commonwealth has failed to prove either that the defendant acted in self-defense or that he used only the reasonable amount of force necessary to protect himself under the circumstances."

The situation was a complex one; the instructions lengthy; and the judge understandably could have misspoken here. Assuming that the defendant was entitled to have his claim of self-defense go to the jury, there are two problems with the above instruction. First, after initially stating the proposition correctly, the judge then defined the Commonwealth's burden erroneously by stating that "the Commonwealth [must] . . . prove either that the defendant acted in self-defense or that he used only the reasonable amount of force necessary to protect himself under the circumstances." The burden is in fact the opposite. To prevail, the Commonwealth must prove either that the defendant did *not* justifiably act in self-defense or that, in defending himself, he

did *not* employ a reasonable level of force. Cf. *Commonwealth v. Acevedo*, 427 Mass. 714, 716-717 (1998) (same principle in defining Commonwealth's burden to disprove defendant's assertion of provocation).

We conclude, however, that the misstatement could not have affected the outcome. Having returned a verdict of murder in the first degree, the jury had to have rejected the theory of self-defense altogether. Had the jury believed the defendant acted in self-defense, either at an appropriate or excessive level of force, they could not have arrived at a verdict of murder in the first degree.

Second, the judge deprived the defendant of an instruction to which he was entitled,[20] that a finding by the jury that he acted in self-defense and did not employ excessive force required a verdict of not guilty. The judge stated in this regard, "If the Commonwealth has failed to prove to you beyond a reasonable doubt the absence of self-defense, a killing committed during the exercise of self-defense, even if it was excessive force used and therefore not a justified killing, would be reduced to manslaughter." This is, of course, incorrect when applied to self-defense without excessive force. By lumping excessive force in with permissible force in self-defense, the judge failed to explain that, if the defendant acted with reasonable force in self-defense, he was entitled not to a verdict of manslaughter, but to a verdict of not guilty.

We conclude, however, that this omission also could not have affected the outcome. The judge made it clear elsewhere in her instructions that, in order to convict the defendant of murder, the Commonwealth must prove, beyond a reasonable doubt, that the killing was unlawful.[21] She discussed the role of self-defense in that determination, communicating effectively that a death that results from self-defense is not an unlawful killing.[22] In addition, the jury's verdict of murder in the first degree

---

[20]We assume again that the evidence required that the issue of self-defense go to the jury.

[21]The judge explained that, "[t]o prove murder in the first degree under the felony murder theory, the Commonwealth must prove beyond a reasonable doubt that the defendant committed an unlawful killing."

[22]The judge stated, "A homicide committed in the proper exercise of self-defense is excused and therefore not a crime." This concept was communicated more than once.

demonstrated that they rejected outright the defendant's assertion that the killing was a product of self-defense.

Moreover, at the end of her charge, after consulting with the attorneys at sidebar, the judge stated:

> "On the issue of self-defense, I gave you the instruction that a person can use reasonable force under the circumstances that self-defense would arise. And the use of, the proper use of self-defense is it justifies the killing, it is excused and therefore it is not an unlawful killing."

This instruction informed the jury that the proper exercise of self-defense should result in an acquittal. Thus she explained sufficiently that, if the defendant engaged in the proper exercise of self-defense, there can be no verdict of murder. Despite the earlier misstatement, her final instructions on self-defense clarified the proper role of self-defense. See *Commonwealth* v. *Van Winkle*, 443 Mass. 230, 240-241 (2005) (judge erred in failing to instruct that Commonwealth had to prove beyond reasonable doubt that defendant did not act on reasonable provocation, but instructions as whole were adequate because elsewhere in charge judge explained properly Commonwealth's burden); *Commonwealth* v. *Niemic*, 427 Mass. 718, 720-722 (1998) (errors in instructions on adequate provocation and Commonwealth's burden did not create substantial likelihood of miscarriage of justice taking charge as whole).

We have reviewed the entire record and have considered all the issues on appeal. We conclude that there is no reason to exercise our power under G. L. c. 278, § 33E, to order a new trial or to reduce the defendant's murder conviction to a lesser degree of guilt.

10. *Other conviction.* As the defendant makes no independent argument concerning his conviction of assault and battery by means of a dangerous weapon, and that conviction is not subject to review pursuant to G. L. c. 278, § 33E, we affirm that conviction as well.

*Judgments affirmed.*